**LANDSCAPE FORMS, INC., Plaintiff,**

v.

**COLUMBIA CASCADE COMPANY, Defendant.**

**No. 94 Civ. 8122 (JES).**

United States District Court, S.D. New York.

Oct. 16, 1996.

Heslin & Rothenberg, P.C., Albany, New York, for Plaintiff (Susan E. Farley and Nicholas Mesiti, of counsel).

Ahmuty, Demers & McManus, Albertson, New York (Frederick B. Simpson and Janice Berkowitz, of counsel) and Siller, Wilk & Mencher, New York City (Allen G. Reiter, of counsel), for Defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

The instant action comes before the Court on remand and vacatur of a preliminary injunction for the Court to consider whether the design of Landscape Forms, Inc.'s ("Landscape") Petoskey furniture is functional and therefore not protectable trade dress. For the reasons that follow, Landscape's furniture design is not functional, and the Court's earlier preliminary injunction is reinstated.

## BACKGROUND

The background relevant to the instant action, set forth briefly herein, is set forth in greater detail in an earlier opinion of the Court of Appeals. *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 70 F.3d 251 (2d Cir.1995).

Landscape and Columbia Cascade Company ("Columbia") manufacture and sell site furnishings to large commercial and municipal entities in the United States. *Id.* at 252. Beginning in the Fall of 1989, Landscape introduced the Petoskey Collection of modern outdoor furniture. *Id.* The most notable pieces in the collection are benches made of three-inch metal tubing which is bent to form the legs and the support for the furniture. *Id.* The benches are shaped and curved to fit the human form and are supported by only two or three legs, giving them the appearance of being suspended in air. *Id.* In early 1994, Columbia emulated the Petoskey design by introducing its own Colonnade line. *Id.*

On November 9, 1994, Landscape filed suit alleging that Columbia's Colonnade line infringed the trade dress of its Petoskey Collection, in violation of § 43(a) of the Lanham Act and New York state unfair competition and dilution law. On December 30, 1994, Landscape moved for a preliminary injunction. The Court held a hearing on January 17 to 19, 1995, and at the close of testimony, issued a temporary restraining order prohibiting Columbia from selling or advertising its Colonnade furniture.

On February 14, 1995, the Court heard summations and issued an opinion from the bench finding that Landscape had demonstrated at least substantial questions going to the merits of its Lanham Act claim, *i.e.* that the trade dress of the Petoskey furniture was distinctive; that there was a likelihood of confusion between the Colonnade and Petoskey lines, *see Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); and that the balance of hardships tipped decidedly in favor of Landscape. *Landscape Forms,* 70 F.3d at 252–53. On March 3, 1995, the Court issued a preliminary injunction prohibiting Columbia from selling and advertising its Colonnade furniture in the United States.

Columbia appealed, and on November 13, 1995, the Second Circuit vacated the preliminary injunction and remanded for the Court to consider the affirmative defense of functionality. *See Landscape Forms,* 70 F.3d at 253–55. Specifically, the Second Circuit instructed the Court to consider whether the Petoskey design " 'confers a significant [competitive] benefit' to Landmark [sic] 'that cannot practically be duplicated by the use of alternative [furniture] designs, . . . thus making the design functional and not protectable trade dress.' " *Id.* at 254 (quotations and citations omitted).[1]

On January 2 to 4, 1996, pursuant to the remand, the Court held a hearing to weigh the evidence and make additional factual findings. At the hearing, Landscape called four witnesses: Arno Yurk, an industrial designer for Landscape; William Main, Landscape's President; S. Kenneth Kirn, Columbia's President; and Leonard Hopper, the chief landscape architect for the New York City Housing Authority. *See* Hearing Transcript Dated January 2 to 4, 1996, ("Tr.") at 65–66, 140, 172–73, 212. Columbia called one witness, Joseph Fasanella, the vice president of Mid–Atlantic Products, a manufacturers' representative. Tr. at 44. The Court also reviewed post-hearing briefs, together with exhibits and excerpts of deposition testimony.

At the hearing, Landscape elicited testimony that over a five year period, the Petoskey Collection accounted for approximately $9,500,000 in sales. Tr. at 142. Of this number, Landscape retained approximately $4,750,000 in net profits, after the deduction of installation, procurement, and reselling costs. Tr. at 142–43. In 1989, the Petoskey's first year, sales generated approximately $300,000. Tr. at 144. In its best year, Landscape retained $1,299,000. *Id.* The site furnishings market, as a whole, was estimated to be worth $120,000,000. Tr. at 141.

---

1. The same day that the Second Circuit remanded the instant action, it issued an opinion in *Knitwaves, Inc. v. Lollytogs, Ltd.,* 71 F.3d 996, 1009 (2d Cir.1995), in which it reversed a district court's judgment in favor of plaintiff's Lanham Act claim, finding that plaintiff's "designs were not primarily intended as source identification" and therefore failed to qualify for protection as trade dress.

Landscape also elicited testimony to demonstrate that competitors can, with reasonable effort, design benches equivalent to the Petoskey. Moreover, Leonard Hopper, the chief landscape architect for the New York City Housing Authority, testified that with respect to Housing Authority contracts, regulations provide that a lowest bidder may substitute "or equal" furnishings for any that are specified in a contract. Tr. at 212, 216–18.

These "or equal" furnishings must be "substantially the same and function the same" as any materials specified, Tr. at 216, but need not be exactly the same. Tr. at 231. Rather, the words "or equal" mean something that will achieve an aesthetic and functional purpose similar to the other, but in its own fashion. Tr. at 232. Hopper further testified that the "or equal" terminology promotes competition since it "welcome[s] contractors to look for other products" that would meet the Housing Authority's requirements. Tr. at 230–31.

Hopper explained that the context in which furniture is placed is important since it determines the alternatives from which a selection is made, Tr. at 226–28, and that look, materials, durability, and aesthetics are all significant factors in making that determination. Tr. at 228–29, 242. Hopper further testified that he considered the Trystan bench, Tr. at 235–36, 250, the DuMor bench, Tr. at 250, the Ultrum bench, Tr. at 237–38, 250–52, and the Wabash bench, Tr. at 250, as "or equal[s]" to the Petoskey. Hopper also indicated that a number of benches could be considered "or equal[s]" to the Petoskey wooden bench and the Petoskey perforated steel bench. Tr. at 251–52.[2]

Columbia introduced evidence to establish that its Colonnade line accounted for approximately $15,000 in sales, that $40,050 in orders were cancelled as a result of the Court's injunction, and that $253,174 in quotes were withdrawn. Tr. at 325–29; Plaintiff's Attachment to Post–Hearing Brief, No. 10. Landscape disputed this evidence as inconsistent with earlier testimony and contended that Columbia only sold two benches, that all orders were cancelled prior to the injunction, and that at most $23,985 in quotes were withdrawn. Tr. at 173; Plaintiff's Post–Hearing Memorandum at 13.

Landscape further introduced evidence that Columbia was a reasonably successful business prior to introducing the Colonnade line, which accounted for only a fraction of Columbia's total sales. Tr. at 178–79. Columbia presented no evidence that its overall sales were damaged as a result of the Court's preliminary injunction. Nor did Columbia present any evidence establishing that it had made any effort whatsoever to create its own design prior to copying the Petoskey Collection.

## DISCUSSION

After reviewing the evidence elicited at the hearing and submitted thereafter in the post-hearing briefs, the Court concludes that Columbia has failed to establish that affording trade dress protection to the Petoskey furniture line would effectively foreclose or compromise its ability to compete in the outdoor site furniture market. While it is unquestionably true that the Petoskey bench is an excellent and innovative design, it is clear from the evidence that there are a large number of available designs that can, with even a modest amount of creative effort, be utilized to compete effectively in terms of price, quality, and aesthetic appeal.

Moreover, the evidence demonstrated that there are benches already existing in the site furniture market which an expert, whose testimony the Court finds both persuasive and credible, identified as both comparable and competitive with the Petoskey bench in terms of quality, price, and aesthetic appeal. See Tr. at 228–29, 235–36, 237–38, 242, 250–52. Furthermore, testimony which the Court finds credible, also demonstrated that with respect to Government sponsored projects, which are major purchasers of site furniture, legal bidding requirements require that con-

---

**2.** Landscape's evidence further indicated that it designed the Petoskey line to have a unique, harmonious, and cohesive look with a source-identifying function. Tr. 71, 73. In addition, although aesthetics drove the engineering of the product, Landscape wanted to sell the bench at a cost low enough to increase profits. Tr. 79, 167.

sideration be given to other comparable benches, even on bids specifically calling for the Petoskey bench. *See* Tr. at 216–18. There is thus no persuasive evidentiary support for Columbia's defense of aesthetic functionality.

This conclusion is reinforced by the total absence of any proof from Columbia as to what efforts it made to respond to the originality of the Petoskey line by designing a bench that would enable it to compete more effectively in the market with that furniture line. Indeed, Columbia's aesthetic functionality defense amounts to no more than an assertion that the success and uniqueness of the Petoskey line entitles it to copy its competitors' trade dress. If that were the case, then the very features which would normally be a basis for trade dress protection would require that that protection be denied.

This is especially true since Columbia failed to elicit any credible proof as to how it has been adversely impacted in the market by the Petoskey design. Indeed the evidence established that its Colonnade line, the line copied from the Petoskey bench, constituted a small fraction of its overall business, and there was no proof that Columbia's overall sales had declined as a result of its inability to compete with Landscape's Petoskey Collection. *See* Tr. at 179. While Columbia claimed that it lost about $40,000 in cancelled orders and about $250,000 in withdrawn quotes, the Court finds that proof neither credible or persuasive. *See* Tr. at 325–29; Plaintiff's Attachment to Post–Hearing Brief, No. 10. The Court finds more credible and persuasive the proof establishing that (1) Columbia's claimed lost sales were inconsistent with testimony elicited at the prior hearing; (2) that Columbia sold at best two benches; (3) that all orders were cancelled even prior to the issuance of any injunction in this case and were thus unrelated to Columbia's inability to sell the Petoskey bench; and (4) that at best about $23,000 in quotes were withdrawn as a result of these proceedings. *See* Tr. at 173; Plaintiff's Post–Hearing Brief at 13.

Having concluded that the defense of aesthetic functionality is factually unsupported, the only issue left for this Court to re-solve is whether Landscape's trade dress should be denied Lanham Act protection because it may not have been "primarily" intended to serve a source identifying function. *See Knitwaves, Inc. v. Lollytogs Ltd., Inc.,* 71 F.3d 996, 1008–09 (2d Cir.1995). However, nothing in *Qualitex Co. v. Jacobson Products Co., Inc.,* —— U.S. ——, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995), or *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), lends any support to the conclusion that an "either/or" or "more primary or less primary" analysis is either essential or appropriate to a determination of whether a distinctive trade dress is entitled to Lanham Act protection.

As another decision of the Circuit Court recognized, the determination of whether a distinctive trade dress is entitled to Lanham Act protection is in essence a resolution of the tension that necessarily arises between the need to encourage and protect creativity in the market place while at the same time insuring that no competitor in the market is able to insulate itself from effective competition. *See Fabrication Enterprises, Inc. v. Hygenic Corp.,* 64 F.3d 53, 58–59 (2d Cir. 1995). The resolution of that tension requires a careful balancing of variables that does not lend itself to an all or nothing approach.

As the Second Circuit stated, in rejecting a district court's view that establishing usefulness was sufficient to establish an aesthetic functionality defense:

> In *Stormy Clime* [*v. ProGroup,* 809 F.2d 971 (2nd Cir.1987)], we held that a court conducting a functionality inquiry must take account of two risks which, if badly managed, might result in either too great or too little protection of competition. On the one hand, to the extent that the product feature or design at issue enhances the distinctiveness of the product, there is a risk that failure to protect the feature or design will cause confusion and allow competitors to benefit unfairly from the original manufacturer's investment in its product's appearance. If such confusion occurs, meaningful competition is frustrated because "[w]ithout some ... method of product identification, informed consumer

choice, and hence meaningful competition in quality, could not exist." *Smith v. Chanel, Inc.*, 402 F.2d 562, 566 (9th Cir. 1968); *accord* 1 MCCARTHY § 3.02[2]. On the other hand, because a product feature or design that enhances the distinctiveness of the product also might contribute to the usefulness of the product, there is a risk that protecting the feature or design would give the manufacturer an unfair competitive advantage because competitors will be prohibited from incorporating that feature into their designs. *Warner Bros.*, 724 F.2d at 331; *Stormy Clime*, 809 F.2d at 976 (footnote omitted).

In order properly to account for these risks, a court must examine a number of variables, including (1) the degree of functionality of the similar features of the product, (2) the degree of similarity between the non-functional (ornamental) features of the competing products, and (3) the feasibility of alternative designs that would not impair the utility of the product. "These factors should be considered along a continuum. On the one end, unique arrangements of purely functional features constitute a functional design. On the other end, distinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional and hence eligible for trade dress protection." *Stormy Clime*, 809 F.2d at 977 (citations omitted). The Supreme Court's emphasis in *Qualitex* on assessing how trade dress protection might affect competition when applying the functionality doctrine makes this multi-factored, industry-sensitive test even more vital, because only by examining all of these factors can a court accurately assess how the extension of Lanham Act protection to useful features may effect competition.

The District Court began and ended its analysis with determining whether the feature is important to the usefulness of the item. The approach does not appear to acknowledge the possibility that *a useful product feature may serve both source-identifying and utilitarian ends and that the competitive benefits of protecting the source-identifying aspects of the feature under the Lanham Act may outweigh the competitive costs of precluding competitors form using the feature. It therefore does not account for all of the variables that are relevant to assessing the potential competitive impact of extending Lanham Act protection to the product feature or design. We hold that this was error* (emphasis added).

*Fabrication Enterprises*, 64 F.3d at 58, 59; *see also Krueger International, Inc. v. Nightingale, Inc.*, 915 F.Supp. 595 (S.D.N.Y.1996).

In this case, the Court finds the evidence to be clear and convincing that the Petoskey trade dress is unique, beautiful, innovative, and justly entitled to a market advantage that should flow to a product that reflects both creative effort and artistic integrity. If the broad purposes underlying the Lanham Act are to have any meaning whatsoever, a competitive advantage obtained as a result of superior effort and accomplishment cannot and should not be forfeited merely because its excellence makes it profitable for competitors to copy it. In sum, Columbia had both the ability and the incentive to come up with its own competitive product, and therefore may not, in the face of its indolence in failing to do so, seek to reap the benefits of Landscape's creative efforts by copying its unique and aesthetically appealing trade dress.

In any event, the record in this case clearly supports the conclusion that the Petoskey line was designed to have a cohesive, unique and harmonious appeal that would cause the market to identify its trade dress with Landscape in the market. Indeed, that objective drove the physical engineering of the line. Since Landscape, as a commercial venture, was in business to turn a profit, and since its ability to achieve that objective was dependent on its ability to identify its product with its source, the Court concludes that the unique trade dress and its aesthetic appeal, were primarily designed to identify the Petoskey Collection with Landscape. It follows that even applying the primary purpose test referred to in *Knitwaves*, Landscape's unique trade dress is entitled to Lanham Act protection.

## CONCLUSION

For the reasons set forth above, Landscape's original preliminary injunction is reinstated.

It is **SO ORDERED.**