SAMARA BROTHERS, INC., Plaintiff,

v.

JUDY–PHILIPPINE, INC.,
et al., Defendants.

No. 96 Civ. 5032(DC).

United States District Court,
S.D. New York.

July 17, 1997.

Siller Wilk LLP by Allen G. Reiter, Stuart M. Riback, New York City, for Plaintiff.

Venable, Baetjer, Howard & Civiletti, LLP by William D. Coston, Barbara L. Waite, Washington, DC, for Defendant Wal–Mart Stores, Inc.

## MEMORANDUM DECISION

CHIN, District Judge.

On January 10, 1997, a jury returned a verdict in this case in favor of plaintiff Samara Brothers, Inc. ("Samara") against defendant Wal–Mart Stores, Inc. ("Wal–Mart").[1] The jury found that Samara owned 13 valid copyrights, that Wal–Mart infringed all 13 of those copyrights, and that Wal–Mart did so wilfully. The jury awarded Samara $912,856.77 in profits that Wal–Mart had

---

1. Wal–Mart was the only defendant to go to trial, as all of the other defendants settled with Sa-mara.

earned from selling infringing garments. The jury also found that Samara's trade dress was protectable, that Wal–Mart infringed Samara's trade dress, and that it did so wilfully. The jury awarded Samara $240,-458.53 in profits that Wal–Mart had earned from selling infringing garments. The jury also found that Samara had engaged in deceptive trade practices and awarded $50 in damages on that claim. Finally, the jury found that Wal–Mart had misappropriated a commercial advantage that belonged to Samara in such a way as to cause confusion in the minds of consumers between Samara clothing and Wal–Mart's clothing and that Wal–Mart had done so in bad faith. It awarded Samara no damages on that claim.

Post-trial motions followed. I heard oral argument on the motions on July 14, 1997 and, for the reasons stated on the record, I granted the motions in part and denied them in part. I reserved decision on those portions of the motions relating to Samara's trade dress claim. Although I ruled that I intended to award Samara attorneys' fees, I reserved decision as to the amount of such an award.

I resolve the remaining issues now. Wal–Mart's motion for judgment as a matter of law or for a new trial with respect to Samara's trade dress claim is denied. Samara's motion for injunctive relief with respect to the trade dress claim is granted, but only to the limited extent set forth below. The amount of attorneys' fees to be awarded Samara is set at $275,000, with costs of $33,196.

## I. Trade Dress

■ To recover for trade dress infringement under section 43(a) of the Lanham Act, a plaintiff must prove two elements. First, the plaintiff must prove that its trade dress is protectable by showing that the trade dress is distinctive, *i.e.*, that it is either "inherently distinctive" or has acquired distinctiveness through "secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757–58, 120 L.Ed.2d 615 (1992); *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir.1997).

■ Second, the plaintiff must prove infringement, by showing that the defendant's trade dress has caused or is likely to cause consumer confusion. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 377 (2d Cir.1997); *Fun–Damental Too*, 111 F.3d at 999; *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 139–40 (2d Cir.1991). In seeking injunctive relief, a plaintiff need only show a likelihood of consumer confusion. To recover monetary damages, however, a plaintiff must show actual consumer confusion, except that consumer confusion will be presumed if the plaintiff can prove deliberate deception by the defendant. *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir.1992), *cert. denied*, 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992). In that event, the burden shifts to the defendant to prove the absence of confusion. *Resource Developers, Inc.*, 926 F.2d at 140.

### A. Wal–Mart's Motion

Wal–Mart's motion raises two issues that warrant discussion. First, Wal–Mart contends that Samara's trade dress is not protectable because it is amorphous and contains non-distinctive features commonly and customarily used in children's clothing—themes such as strawberries and sail boats and fabrics such as seersucker—that are not sufficiently distinctive to indicate source. Second, Wal–Mart argues that even if Samara's trade dress is protectable, the record contains no evidence of consumer confusion or any intent on its part to mislead consumers into believing that they were buying Samara garments when they were actually buying Wal–Mart garments.

#### 1. Protectability

Wal–Mart's protectability argument is based primarily on *Landscape Forms*. There, the Second Circuit confirmed its holding in *Knitwaves* that in considering "inherent distinctiveness" in "product design or configuration" cases, the question is "whether the design was likely to be understood as an indicator of the product's source." 113 F.3d at 378 (citing *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1008 (2d Cir.

1995)). Design cases—where the trade dress involves the design of a product rather than its packaging or labelling—are problematic, for the design of a particular product is less likely to be an indicator of source than packaging, labels, and trademarks. The *Landscape* Court cautioned that, in considering design cases, courts must remember that trade dress law is intended:

> to accord protection to symbols consumers are likely to rely upon in distinguishing goods, while denying protection that would hamper efforts to market competitive goods.

*Id.* at 380. The Court also noted that "when protection is sought for an entire line of products, [the] concern for protecting competition is acute." *Id.*

Here, Wal–Mart argues that the jury could not have reasonably found that Samara's trade dress was an indicator of source. According to Wal–Mart, the Samara "look" was so amorphous and used features so commonly found in children's clothing that it was not sufficiently distinctive to have identified Samara as being the source of the garments. While Wal–Mart's arguments have some merit, I am not persuaded that the jury's verdict should be set aside.

As the Second Circuit recognized in *Landscape*, "there is no question that trade dress may protect the 'overall look' of a product." 113 F.3d at 381; *accord Krueger Int'l, Inc. v. Nightingale Inc.*, 915 F.Supp. 595, 607 (S.D.N.Y.1996) (holding that plaintiff had a protectable trade dress in the "overall look" of its chair). Even if " 'each element of a trade dress individually might not be inherently distinctive, ... the combination of elements' may be indicative of source." *Landscape*, 113 F.3d at 381 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir.1995)).

*Landscape* identifies a number of factors that may be considered in determining whether a "design was likely to be understood as an indicator of the product's source." *Id.* at 377 (citing *Knitwaves*, 71 F.3d at 1008). These include the manufacturer's subjective intentions, whether the design was a common basic shape or design, whether it was unique or unusual in a partic-

ular field, whether it was a mere refinement of a commonly adopted and well-known form of ornamentation for a particular class of goods, and the similarity of the product to others on the market. *Id.* at 378 n. 3; *see also Seabrook Foods, Inc. v. Bar–Well Foods, Ltd.*, 568 F.2d 1342, 1344 (Cust.&Pat.App. 1977). Other factors that may not directly shed light on whether a design is an indicator of source but that may be relevant indirectly—because they may show secondary meaning—include, as the jury was charged, the plaintiff's advertising expenditures, sales success, and attempts to plagiarize the plaintiff's trade dress. (Tr. 669).

█ The jury's conclusion that Samara's trade dress was sufficiently distinctive to be protectable is supported by the following evidence in the record: (1) the efforts made by Samara over the years to develop "the Samara look," to produce garments that "look like [they] come[ ] out of our office," that have a "consistent feel" to them, to "build a brand loyalty and establish a customer base" (Tr. 209); (2) Samara's consistent use of seersucker, large appliques usually integrated into the construction of the garments, and garment designs, including scalloped collars, matching pockets, and the lack of excess ornamentation, to develop a clean, simple, uncluttered but elegant "look"—a look of "simple sophistication" (Tr. 144–65); (3) Samara's advertising efforts, which include, for example, spending approximately $100,000 on advertising in 1996 (Tr. 63–65); (4) Samara's sales success; (5) Wal–Mart's efforts to plagiarize the Samara look; and (6) the garments themselves. The jury saw dozens of garments, not only Samara and Wal–Mart garments, but children's garments sold by many other companies as well. Thus, the jury saw for itself the designs of the Samara products, the Wal–Mart products, and other competing products. While it is true that certain elements of Samara's designs were not protectable, the jury reasonably could have found that the combination of these elements was distinctive and thus protectable.

Mr. Kleist himself—Wal–Mart's buyer—acknowledged that there was a "Samara look." He testified:

Q. Isn't it a fact, Mr. Kleist, that at least some of the samples that you saw you recognized as Samara garments because you had bought them when you were a buyer at Sears, isn't that right?

A. Yes.

. . .

THE WITNESS: Like I said earlier, there were 20, 30, some number of seersucker samples. I don't remember which ones had labels, which ones did not have labels. There were probably some with labels and some without labels.

Q. Did you recognize any of these garments as being Samara garments?

A. I recognized the Samara type of look but do I know if they had Samara labels in them, no.

(Tr. 323, 394–95). Thus, Kleist's testimony supports the jury's finding that the overall design of Samara's garments—including its trade dress and its "look"—was distinctive, and therefore protectable.

### 2. Consumer Confusion

■ Wal–Mart's second point that warrants discussion is its contention that the record does not support the jury's finding with respect to consumer confusion. I agree that Samara did not prove actual confusion. Hence, the question is whether the jury reasonably could have found that Wal–Mart deliberately sought to deceive consumers as to the source of its garments and, if so, whether the jury reasonably could have found that Wal–Mart had failed to rebut the resulting presumption of consumer confusion.

The jury's findings in this respect are supported by substantial evidence in the record. First, there was compelling evidence that Wal–Mart intentionally copied Samara's garments. For example, Mr. Kleist testified that he asked Mr. Safdieh, an employee of defendant Judy Philippine, Inc., to create seersucker garments under the Small Steps label that were based on a number of samples, some of which Mr. Kleist recognized as Samara garments. (Tr. at 322–23). Mr. Kleist went on to admit that the garments Wal–Mart ordered from Judy–Philippine were "very similar to some of the Samara garments." (Tr. at 448). In fact, of course, the garments were virtually identical. Indeed, when asked to compare a number of Wal–Mart garments to their corresponding Samara garments, Mr. Kleist admitted that they were "strikingly similar." (Tr. 340–41).

Second, the jury reasonably could have found that Wal–Mart intended to confuse consumers as to the source of its garments. As Samara argued at the hearing on July 14, 1997, the breadth of the copying is incriminating. Wal–Mart sold millions of dollars of the garments in question and it copied not just one garment but an entire series of garments in different styles—all featuring the Samara "look." Wal–Mart's buyers knew that Samara's garments were being copied—the photographs attached to the quote sheets showed the Samara label and Kleist was aware of the Samara look. Yet, they purchased millions of dollars worth of the Samara knock-offs. The jury surely could have inferred that Wal–Mart copied the Samara "look" to confuse consumers.

The jury reasonably could have found that the public was being deceived in two ways. First, consumers might have been drawn initially to Wal–Mart's Samara knock-offs because they thought they were Samara. Even though the consumers might then have realized the garments were not Samara because of the labelling, they might have purchased them anyway because of the low price. They were still deceived. See PAF S.r.l. v. Lisa Lighting Co., Ltd., 712 F.Supp. 394, 411 (S.D.N.Y.1989) ("While a label may help in great degree to distinguish products whose designs are fairly common place . . . where the trade dress is distinctive and the products so closely resemble each other, labeling cannot preclude the possibility that confusion will occur. Consumers may be drawn initially to the infringing product precisely because its trade dress so closely resembles that of the other product.").

Second, the jury reasonably could have found that Wal–Mart was seeking to deceive consumers into believing they were buying Samara garments, albeit at a lower price and under a Wal–Mart label. The jury could have concluded that consumers believed that, because of Wal–Mart's superior buying pow-

er and its ability to negotiate quantity discounts, they were actually buying Samara garments at a discount under a Wal–Mart's house label, when in fact they were buying a Samara knock-off.

Wal–Mart argues that the use of its own labels on these garments would prevent customers from being confused about the source of the garments, relying on Judge Sotomayor's observation that "labels, more than design, provide a traditional means of identifying the manufacturer of clothing.'" *Krueger Int'l, Inc.*, 915 F.Supp. at 604 (quoting *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977 (2d Cir.1987)). In other words, Wal–Mart contends the average consumer would have been alerted to the fact that the garment in question was not a "Samara" because the Wal–Mart label, such as *Cuties by Judy*, was on the garment.[2]

■ The mere placement of labels on allegedly infringing goods, however, does not preclude a finding of confusion. As the Second Circuit noted in *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, "[w]e do not mean to intimate that the distinctive elements of any trade dress may be freely appropriated as long as the junior user clearly identifies the source of the goods." 973 F.2d 1033, 1047 (2d. Cir.); *Life Indus. Corp. v. Star Brite*, 803 F.Supp. 646, 647–48 (E.D.N.Y.1992) ("Defendants' contention that 'when a manufacturer clearly identifies itself on its label, it cannot be held liable for trade dress infringement' is incorrect."). Thus, the mere fact that Wal–Mart placed its own label on the garments does not absolve Wal–Mart of trade dress infringement, and the jury still could have found intent to deceive.

Wal–Mart also relies on a series of cases holding that evidence of copying by itself does not demonstrate that a defendant intentionally set out to deceive consumers. As Professor McCarthy has observed, however,

Close similarity of trade dress in a plethora of detail raises a serious question of copying and *intent to confuse customers.*

In such a situation, all heads turn to defendant to hear some explanation. When no credible explanation is forthcoming, the judge may well respond in the following vein: '[I]t would strain credulity even to consider that the imitations of the three packages was innocent and accidental.... The close copying of all three is eloquent expression of actual intent to pirate, to engage in perfidious invasion by deception of the lay public which buys the products.'

J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 8:19, at 8–47 (4th ed.1996) (emphasis added) (quoting *Johnson & Johnson v. Quality Pure Mfg., Inc.*, 484 F.Supp. 975, 979–80 (D.N.J.1979)).

Here, Wal–Mart copied not one, not three, but *thirteen* different garments. Wal–Mart's garments were virtually identical copies of Samara's, with only a few minor changes in details. The jury heard Wal–Mart's purported explanations, rejected them, and found that Wal–Mart had acted in bad faith specifically with the intent to confuse.

## B. *Samara's Motion*

Samara seeks injunctive relief with respect to the trade dress claim. I will grant injunctive relief, but not to the extent requested.

Samara has proposed a broad injunction enjoining Wal–Mart from infringing Samara's trade dress, as expressed in seven categories of designs, including, for example:

a boy's spring/summer overall-style garment with a single large applique placed either (i) in the center of the chest; or (ii) on the lower front of the garment, to the side.

(Plaintiff's Proposed Judgment, ¶ 2(g)).

The proposed injunction is not workable. I am permitting the jury's verdict on the trade dress claim to stand because the jury actually had Samara's garments and the Wal–Mart knock-offs before it. Hence, the jury could actually see Samara's garments as well as Wal–Mart's garments and therefore it

---

**2.** Wal–Mart also argues that I erred in not including in my charge an instruction on labelling. The argument is rejected. Although I did not include the requested instruction in my charge, Wal–Mart did not raise an objection at the charg-

ing conference. (Tr. 482–508, 510–21, 588–89). Moreover, even in the absence of such an instruction, Wal–Mart was free to argue the point to the jury in summations. (*See, e.g.*, Tr. 506).

had a concrete and specific basis for deciding the issue of trade dress infringement. In terms of injunctive relief for the future, however, Samara has not been able to suggest sufficiently specific language. I cannot, for example, enjoin the use of a simple but sophisticated, clean and cute "look" in children's clothing.

■ I will, however, enjoin Wal–Mart from infringing Samara's trade dress by manufacturing, purchasing, selling, or otherwise distributing any garments (i) copied, directly or indirectly, from any Samara garment, or (ii) bearing appliques or applique combinations, designs, or placements copied, directly or indirectly, from any Samara garment, or (iii) designed using any Samara garment as a source.

### II. *Attorneys' Fees*

I will award Samara attorneys' fees under both the Lanham Act, 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to a prevailing party."), and section 349(h) of the New York General Business Law ("The court may award reasonable attorney's fees to a prevailing plaintiff."). *See Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir.1995) (jury finding of wilful infringement is sufficient to satisfy the "exceptional" case requirement under the Lanham Act); *H.W. Carter & Sons, Inc. v. William Carter Co.*, 913 F.Supp. 796, 805 (S.D.N.Y.1996) (attorneys' fees may be awarded where party has acted in bad faith, wilfully, intentionally, and with callous and reckless disregard for plaintiff's rights, or maliciously, fraudulently, or deliberately).

In determining the amount in attorneys' fees to be awarded, I have reviewed the supporting documentation submitted by Samara, including the time sheets and descriptions of each attorney's experience and background, and I have considered the factors usually considered in determining fee applications, including the skill and time required to litigate the case, the complexity of the issues, the customary rates charged for the type of work, and the results achieved. *See Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir.1992) (discussing the standard to be applied in § 349 cases); *see also PAF S.r.l*, 712 F.Supp. at 414 (Lanham Act case).

I have considered Wal–Mart's objections to the fee application and they are rejected.

I will award attorneys' fees to plaintiff in the amount of $275,000 and costs of $33,196.

### *CONCLUSION*

Wal–Mart's motion for judgment as a matter of law or for a new trial as to the trade dress claims is denied. Samara's motion for injunctive relief and attorneys' fees is granted to the extent set forth above.

SO ORDERED.